Stephen West
Plaintiff in *Propria Persona*
1128 W Pueblo PL
Napa, CA 94558
weststeve8@gmail.com
(707) 980-2392

FILED

DEC 05 2022

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
450 Golden Gate Avenue, Box 36060, San Francisco, CA 94102

LB

STEPHEN WEST
    PLAINTIFF

v.

SCOTT LABORATORIES, INC.
    DEFENDANT

                           /

CV22-7649

CASE NO. _____

## COMPLAINT FOR DISCRIMINATION, RETALIATION, AND PROHIBITED ACTIONS ON THE BASIS OF DISABILITY

Stephen West  ("plaintiff"), sues Scott Laboratories, Inc. ("defendant") for violations of the Americans with Disabilities Act and the Americans with Disabilities Amendments Act of 2008 (hereafter "ADA" and "ADA-AA", respectively), 42 U.S.C. §12101, *et seq.,* for discrimination, retaliation, and prohibited actions taken on the basis of disability under the "regarded as" and "record of" prongs in violation of the Americans with Disabilities Act of 1990 and the Americans with Disabilities Act Amendment Act of 2008 (hereafter "ADA" and "ADA-AA", respectively), 42 U.S.C. § 12101, *et seq.* Plaintiff petitions for declaratory and injunctive relief under Title I of the ADA as implemented under 29 CFR Part 1630, *et seq.*

## PARTIES

1.     The plaintiff resides in Napa, California at the address of 1128 W Pueblo Pl. for all times material to the facts giving rise to the complaint.

2.      The defendant is an "employer" within the definition of 42 U.S.C. 12111(5), with their principal place of business at 1480 Cader Lane, Petaluma, California 94954, for all times material to the facts giving rise to the complaint.

## JURISDICTION AND VENUE

3.      This court has original and exclusive jurisdiction over the plaintiff's claims pursuant to 28 U.S.C. §1331, in that the matters in controversy are brought pursuant to Title I of the ADA and ADA-AA of 2008; 42 U.S.C. §12101 and 42 U.S.C. §12112(a), (b) and (d)(4) as it pertains to "discrimination"; as implemented by 29 CFR Parts 1630.13(b) and 1630.14(b)(3), (c) and (d) as it pertains to adverse employment actions, employers and medical examinations and interventions.

4.      Venue is proper in this judicial district under 28 U.S.C. §1391 because the defendant does business in this judicial district and the acts complained of took place in this judicial district.

5.      The plaintiff timely filed a charge of discrimination against the defendant with the Equal Opportunity Employment Commission (EEOC) on or about the date of August 25, 2022.

6.      The plaintiff has exhausted all administrative remedies and obtained his right to sue letter from the EEOC within the ninety days preceding the date on which he commenced his original complaint against the defendant.

7.      A true and correct copy of the EEOC's right to sue letter is alleged and included as Exhibit A.

8.      The plaintiff has exhausted all administrative remedies available to him.

## PLAIN STATEMENT

9.      Defendant discriminated and retaliated against plaintiff based upon disability. When the plaintiff objected, the defendant sought to impose non-job-related medical treatments and accommodations without first conducting an individualized assessment to determine if he was a direct threat.

**BACKGROUND**

**10.**    Since 2021, the defendant adopted measures known collectively as its "Covid-19 Policy", which included requirements or accommodations that employees wear surgical masks, practice isolation and segregation, submit to medical examinations, and disclose vital statistics as new conditions of employment.

**11.**    The defendant admits that its "Covid-19 Policy" is intended to prevent the spread of "Covid-19", which it describes as a deadly, contagious disease.

**12.**    The policy rests on the assumption that every employee, the plaintiff included, has or could have this disease. That is, the policy's underlying assumption is that all of its employees are simultaneously at risk and pose a risk to the health of all other employees. No provision exists in the policy to establish through individualized assessment whether a particular employee poses any direct threat to the health of their co-workers.

**13.**    The policy imposed mitigation measures developed by the Center for Disease Control and Prevention (CDC), largely recommended for an "over-65, immune-compromised" population.

**14.**    The defendant's "Covid-19 Policy" imposed these measures upon <u>all of its workers</u> without considering the individualized medical assessment of each employee's health or whether the policies were appropriate for the working population.

**15.**    Likewise, no provisions are in place which authorize the policy measures either by legal duty or by statute, thus the defendant's adoption of this policy is <u>voluntary</u>.

**16.**    In the rush to implement the policy no oversight was given to provide the policy with any legal enforcement mechanism.

**17.**    Thus the policy also relies upon the <u>voluntary</u> compliance of employees waiving their rights to informed consent, to medical privacy, to refuse experimental medical treatments and to refuse non-job-related medical inquiries or treatments.

**18.**    A voluntary policy is not a legitimate requirement and cannot trigger compulsory termination.

**19.**     The defendant's policy treated employees either "as if" they carried a specific, active, infectious disease, or "as if" they had an impaired or suppressed immune system that made them prone to contracting "Covid-19". The policy regarded them as disabled with a contagious disease with an impaired immune system.

**20.**     It should also be noted that the policy fails to provide any provisions or guidance for employers to remain compliant with the ADA when they started implementing the new "Covid-19 Policy". This is a major flaw of the "Covid-19 Policy" and one which this case seeks to redress.

**21.**     The policy has no provisions or guidance that instructs the employer on the practice of conducting an individualized assessment[1] once an employee refuses any of the accommodations offered by the policy (such as mask-wearing).

**22.**     The policy fails to outline the process for an employer to follow if it wants to claim an exemption to its duties under the ADA.

**23.**     The policy fails to provide guidance on the manner in which defendant could establish, by financial records, that it would suffer an undue financial burden for an employee's refusal, and it fails to provide guidance on how the plaintiff would document that an employee's refusal would fundamentally alter defendant's normal operations.

**24.**     The policy fails to describe how any provision of the policy is directly related to any single employee's essential job function.

**25.**     The policy also fails to provide guidance on how to give adequate notice to employees as to the manner in which the policy is directly related to the essential job function of any employee, including the plaintiff.

**26.**     The policy failed to include guidance on how to process employees exceptions to the policy under the ADA.

**27.**     Any employee may refuse any accommodation under 29 CFR Part 1630.9(d) if the defendant does not have a *bona fide* exemption or exception from its legal duties under the ADA.

---

[1]     29 CFR 1630.2 (r) Individualized assessment shall include determining whether an individual would pose a direct threat, the factors to be considered include: the duration of the risk; the nature and severity of the potential harm; the likelihood that the potential harm will occur; and the imminence of the potential harm.

**28.**    The plaintiff may refuse any or all accommodations regarding the "Covid-19 Policy" because the policy is not related to his essential job function which is the reason the job exists.

**29.**    The policy also asked representatives of the defendant to make repeated, non-job-related medical inquiries of employees and to impose non-job-related medical treatments on them. It has no provisions for protecting the medical privacy of employees, and specifically the plaintiff's. Medical decisions are far beyond the scope of the employer-employee relationship.

**30.**    The plaintiff took exception to the policy partly because the practices were unrelated to the performance of his essential job functions[2].

**31.**    The policy, as mentioned previously, lacked enforceability, and rather than allow employees to make their own medical decisions, the defendant chose to adopt and implement its "Covid-19 Policy" through obfuscation, coercion, retaliation and interference specifically towards the "unvaccinated" employees, such as the plaintiff.

**32.**    When the plaintiff, as a qualified individual, exercised his right under the ADA to refuse the accommodations imposed by the "Covid-19 Policy" and gave notice that the policy discriminated against him by perceiving him as having an un-assessed disability, the defendant continued to impose these unrequested accommodations.

**33.**    The defendant also retaliated against the plaintiff by interfering with his rights, imposing punitive measures including repeatedly threatening plaintiff with termination, and terminating plaintiff's employment for reasons of disability, actions which were directly and proximately caused by his good faith refusal to participate in the defendant's "Covid-19 Policy".

**34.**    Finally, it must be noted that an "exceptional condition" exists with this case which must be acknowledged. When the United States District Court itself has adopted the same policies as the defendant, it begs the question: can the Court be impartial?

---

[2] 29 CFR 1630.2(n)(2) definition "Essential Function": "(i) ….the reason the position exists is to perform that function."

1

## STATEMENTS OF FACT

2

**35.**    On September 7, 2018, plaintiff was hired by Scott Laboratories to work as a Senior
3    Service Technician. Plaintiff provided field service technical assistance for winery equipment
4    throughout North America.

5
**36.**    On July 12, 2021, Tyler Smith, Parts and Service Manager, emailed plaintiff to
6    participate in a voluntary experimental medical testing program which he had no interest to
7    participate in.

8    **37.**    The offered experimental testing program in no way was related to plaintiff's job
9    functions.

10    **38.**    On September 7, 2021, Tyler Smith, Part and Service Manager, informed plaintiff by
11    email that Scott Laboratories was now requiring employees who worked in the field to
12    complete at-home experimental medical testing and submit results to him and also through
13    a website.

14    **39.**    Defendant was regarding plaintiff as having an un-assessed disability that required
15    mitigation measures.

16    **40.**    Additionally, defendant was requiring personal medical information and submitting to
17    medical treatments that were not related to plaintiff's essential job functions.

18    **41.**    On September 8, 2021, plaintiff emailed Tyler Smith, requesting more safety
19    information regarding the experimental medical testing. He received no answer. Therefore,
20    plaintiff decided to deny these accommodations.

21    **42.**    On September 9 or 10, 2021, Max Levine, COO of Scott Laboratories, called to
22    harass plaintiff regarding the experimental medical testing and offered an ultimatum. Plaintiff
23    was to submit to experimental medical testing, provide his test results to his manager, and
24    post his results on a website or else be terminated from his job.

25    **43.**    Defendant was threatening plaintiff with retaliatory actions to force him to waive his
26    rights to medical privacy and his rights protected under the ADA.

27    **44.**    On September 13, 2021, Max Levine, COO, called again to harass plaintiff regarding
28    the experimental medical testing.

45.   Plaintiff had not received the necessary safety information he previously requested. Thus, he did not consent to the experimental medical testing nor to giving up his private medical information and personal property.

46.   On September 14, 2021, Max Levine, COO; Tyler Smith, Parts and Service Manager; and Evelyn Padilla, Human Resources, called to terminate plaintiff's employment for not submitting to Scott Laboratories experimental medical testing policy.

47.   On August 23, 2022, plaintiff filed a complaint with the EEOC.

48.   On September 19, 2022, plaintiff received a Right to Sue Letter from the EEOC.

49.   A true and correct copy of all written communications are attached in Exhibit A.

### COUNT I. COMPLAINT FOR DISCRIMINATION IN VIOLATION OF THE ADA AS AMENDED

50.   Plaintiff re-alleges each of the foregoing statements and those in his affidavit, and incorporates each herein and further alleges that this is a case of first impressions.

51.   The defendant is a covered entity as defined under 42 U.S.C. §12111(5) of the ADA.

52.   Disability cases typically involve plaintiffs who have assumed the burden of proof under the "actual" or "diagnosed" prong of the ADA; whereas, the plaintiff is proceeding under both the "regarded as" and the "record of" prongs of the ADA where the burden of proof is upon the defendant to prove that it qualified for an exemption or exception to their legal duties to comply with the ADA. These are further expressed in this complaint.

53.   The plaintiff belongs to a minority of employees claiming to being regarded as having a disability by the "Covid-19 Policy".

54.   The plaintiff was obviously qualified for a job he was already doing, and he was willing to the job.

55.   Despite the plaintiff's qualifications, the plaintiff was terminated.

56.   The defendant's implementation of the "Covid-19 Policy" was a direct and proximate cause of the defendant's decision to terminate plaintiff's employment.

57.   There was no other reason to terminate plaintiff's employment.

**58.**   This is a case of "first impression" because the plaintiff has exercised his rights to medical privacy and informed consent to refuse the "Covid-19 Policy's" medical treatments.

**59.**   These rights are not limited merely to the "doctor-patient" relationship, but are squarely rooted in the ADA under 29 CFR Parts 1630.9(d), 1630.12(b), 1630.13(b), and 1630.14(c) and (d) for the reason that these rights are <u>intangible private property rights of people,</u> and of the plaintiff specifically, and are protected by law and are not originated or granted by any statute.

**60.**   These rights existed long before any laws were adopted by modern society and in fact, have been exercised in the formation of modern society.

**61.**   The defendant has failed to show its "Covid-19 Policy", which is not authorized by any statute, overcame established rights that form the bedrock of modern society.

**62.**   This is also a case of "first impression" because the plaintiff, in using the ADA to protect his rights,  has asked the question: how did the defendant suddenly acquire a new legal authority or legal duty to treat the plaintiff, its employee, for a disease without any medical examination or diagnosis?

**63.**   The answer of course is that the defendant never did acquire any legal duty or authority to treat the plaintiff for a disease without any medical examination or diagnosis.

**64.**   This is also a case of "first impression" because, while the defendant makes the noble-sounding but disingenuous claim that their "Covid-19 Policy" is intended to prevent the spread of "Covid-19", it has absolutely no financial responsibility to engage in or administer such a policy.

**65.**   In fact, employers may adopt a "Covid-19 Policy" for the entirely ulterior motive of qualifying for the government's disaster relief funds.

**66.**   The defendant has not provided proof of any financial responsibility (insurance, etc.) to compensate anyone for becoming infected with "Covid-19" after complying with their "Covid-19 Policy".

**67.**   The defendant has not provided proof of any financial responsibility (insurance, etc.) to compensate anyone for suffering any adverse health consequences as a result of complying with its "Covid-19 Policy".

**68.**     This is additionally a case of "first impression" because, if the defendant actually had the novel and *bona fide* legal right to require the plaintiff to disclose his medical records, then the defendant would have the right to simply obtain the name and address of the plaintiff's physician and request such records directly from the physician.

**69.**     It is well-established that no physician would make such disclosure without the express written permission of the patient (plaintiff) or without a *bona fide* court order.

**70.**     The defendant's "Covid-19 Policy" is a failed policy because it does not include several necessary provisions.

**71.**     It has no provisions for remaining compliant with disability law or addressing the needs of employees with disabilities.

**72.**     It has no provisions for protecting the medical privacy of employees, and specifically the plaintiff's.

**73.**     It lacks any authorized enforcement provisions and relies either on the plaintiff to voluntarily waive his rights to medical privacy, informed consent, and rights protected under the ADA **or** upon the defendant's willingness to force submission to the policy in exchange for disaster funding.

**74.**     The defendant's "Covid-19 Policy" fails to provide any advice or instruction on how to conduct any individualized assessment[3].

**75.**     For those employees claiming rights under the ADA, the policy fails to identify that an ADA representative of the defendant will be necessary to oversee that the policy remains in compliance.

**76.**     In fact, the defendant's "Covid-19 Policy" completely ignores all legal duties to aid and encourage those with disabilities under the ADA.

**77.**     The defendant presumes that it "somehow" acquired the legal duty and legal authority to cure or treat the un-assessed disability by imposing the policy measures upon the plaintiff.

---

[3]   29 CFR 1630.2 (r) Individualized assessment shall include determining whether an individual would pose a direct threat, the factors to be considered include: the duration of the risk; the nature and severity of the potential harm; the likelihood that the potential harm will occur; and the imminence of the potential harm.

**78.** The defendant claims that its "Covid-19 Policy" is a legitimate requirement, which authorizes termination for non-compliance, yet the defendant fails to act under any legal authority or legal duty to impose its policy measures on employees.

**79.** Simply claiming that a policy is "mandatory" or "required" does not automatically make it compulsory or legitimate.

**80.** The plaintiff is regarded as having a disability by the defendant's "Covid-19 Policy", which, according to the defendant, was intended to prevent the spread of the contagious disease known as "Covid-19".

**81.** Although the plaintiff is not required by law to discuss the nature of an un-assessed disability he was assumed to have, for clarity's sake he alleges that the defendant's policy rested on the assumption that every employee, the plaintiff included, had or could have this disease.

**82.** That is, the defendant's "Covid-19 Policy's" underlying assumption was that all of its employees were simultaneously at risk and also posed a risk to the health of all other employees.

**83.** It is undisputed that the defendant openly admitted that the purpose of such policy was the prevention of the spread of "Covid-19".

**84.** The defendant's "Covid-19 Policy" regarded the plaintiff as having "Covid-19" or being prone to getting infected with "Covid-19".

**85.** All mitigation measures flowed from this premise, and the defendant terminated the plaintiff specifically for not submitting to medical examinations and medical treatments, and for not disclosing private medical information.

**86.** It is not necessary to allege that the defendant's agents personally regarded the plaintiff as having a disability, the defendant's "Covid-19 Policy" clearly demonstrates that the defendant sought to impose the policy's provisions upon the plaintiff based upon the pure speculation, stereotype and generalization that he was infected or may in the future become infected with a deadly, contagious disease (e.g. "Covid-19").

## NON-JOB RELATED MEDICAL INQUIRIES

**87.** The defendant required non-job-related medical examinations of the plaintiff that were not consistent with any conceivable business necessity.

**88.** The defendant made disability-related inquiries of the plaintiff that were not consistent with business necessity and not permitted under 29 CFR Part 1630.13(b).

**89.** The defendant's "Covid-19 Policy" imposed certain non-job-related medical inquiries ("accommodations") on the plaintiff including, but not limited to: disclosing private medical records and medical history; and disclosing vital statistics, like body temperature, which are a diagnostic tool of physicians but are not a diagnosis in and of themselves.

**90.** The defendant's "Covid-19 Policy" imposed submitting to medical tests[4] which are a diagnostic tool of physicians but are not a diagnosis in and of themselves. This practice results in the absurd situation of relying upon a lay-man's "self-diagnosis" based upon interpreting one piece of data rather than upon a physician's professional finding.

**91.** The defendant also assumes that its policy was the proper treatment to mitigate the effects of "Covid-19" in the workplace.

**92.** The defendant's "Covid-19 Policy" imposed certain non-job-related medical treatments including, but not limited to: taking experimental vaccines;  wearing a surgical mask over the face; engaging in "social distancing" which is a euphemism for quarantine and isolation.

**93.** These medical treatments and medical inquiries are beyond the scope of the employee-employer relationship (contract) when they are non-job-related; in addition the defendant is trespassing on the plaintiff's medical privacy rights, both of these issues are expressed in the ADA.

**94.** The defendant never provided notice of any kind to the plaintiff, advising the plaintiff as to the manner in which these medical treatments and medical inquiries were related to his essential job function.

---

4   "Covid-19 testing" results does not verify a diagnosis of being infected with "Covid-19", the test it is designed to detect the presence of a coronavirus, of which there are many, including the common cold. The tests also give many false positives when they are were not set to correct cycling according to instructions.

**95.**   In fact, none of the accommodations were related to the plaintiff's essential job function because he was able to continue performing his essential employment duties without participating in the defendant's "Covid-19 Policy".

**96.**   The plaintiff also alleged in his testimony and in written communications[5] that he was both willing and able to continue performing his employment duties and that the defendant's "Covid-19 Policy" was not related in any way to his essential job functions.

**97.**   The plaintiff also alleges that the defendant failed to give conspicuous notice as to the manner in which such policies were related to the plaintiff's essential job functions.

**MEDICAL PRIVACY**

**98.**   Furthermore, the defendant's "Covid-19 Policy" violates 29 CFR §1630.14(c) of the ADA because it involves sharing non-job-related medical classifications (e.g. "vaccination status", vital statistics and "PCR"[6] testing history) without any regard to confidentiality.

**99.**   The "Covid-19 Policy" includes no provision to preserve the medical privacy rights of any employee, including the plaintiff's.

**100.**   The defendant's policy purportedly requires employees to examine themselves, and then make a self-diagnosis[7] upon which the defendant intends to rely as if such diagnosis was obtained by a licensed, qualified professional physician.

**101.**   The defendant's "Covid-19 Policy" also impairs the plaintiff's ability to perform his essential job functions by imposing mitigation measures which create a physical impairment that substantially limits the plaintiff's ability to engage in one or more major life activities, such as working, communicating with others, caring for oneself, breathing, etc.

**102.**   The defendant refused to allow the plaintiff to continue working without first submitting to its discriminatory "Covid-19 Policy".

**103.**   The plaintiff is not required to discuss the nature of an un-assessed disability he is "assumed" to have; nor is he required to request any "reasonable modifications", for an un-assessed disability he is assumed to have.

---

5 A true and correct copy of which is alleged as Exhibit A.
6 Polymerase Chain Reaction
7 "Covid-19 testing" results does not verify a diagnosis of being infected with "Covid-19", the test it is designed to detect the presence of a coronavirus, of which there are many, including the common cold.  The tests also give many false positives when they are were not set to correct cycling according to instructions.

**104.**   The plaintiff was always protected under the ADA once he opposed the policy.

**105.**   The plaintiff is not required to use the language of the ADA to claim this protection.

### ABSENCE OF AN INDIVIDUAL ASSESSMENT

**106.**   The defendant failed to conduct any individualized assessment establishing that the plaintiff's good faith refusal to participate in its "Covid-19 Policy" was a direct threat.

**107.**   The defendant simply punished the plaintiff for his refusal on the pure speculation that the plaintiff had a disability known as "Covid-19".

**108.**   The defendant acted on the pure speculation that someday the plaintiff might have such a disease.

**109.**   The defendant acted on the false premise that it had the legal duty and authority to protect the plaintiff and everyone else from contracting such a disease (disability).

**110.**   The defendant claimed that the plaintiff had a deadly contagious disease, or that he might someday become infected with such a disease, is not a defense to violating the ADA, specifically, 29 CFR Parts 1630.9(d), 1630.12(b), 1630.13(b) and 1630.14(b), (c) and (d).

**111.**   The defendant cannot rely upon news or public announcements to determine that the plaintiff individually poses a direct threat because the statute requires a *bona fide* medical examination and diagnosis by a physician.

**112.**   The "Covid-19 Policy" does not include a provision for requiring an individualized assessment by a physician to determine whether the employee poses a direct threat in the first place yet it requires employees to obtain a note from their physician in order to qualify for a "medical exemption" to the policy.

**113.**   The defendant acted irrationally by regarding the plaintiff and others as having an illness without any diagnosis, and then sought to treat everyone with the same medical intervention without any diagnosis. This behavior is defined as a mental illness in the Fifth Edition of the Diagnostic and Statistical Manual for Mental Health.[8] The "Covid-19 Policy" generates such irrational behavior from those seeking to impose that they act "as if" they are suffering from an un-diagnosed mental illness.

---

[8]   Factitious Disorder or Munchhausen Syndrome by Proxy.

### RECORD OF A DISABILITY

**114.** The plaintiff is also entitled to the protections established in the ADA under the second prong which establishes coverage when others make a "record of" an individual's disability.

**115.** The defendant's "Covid-19 Policy" assumes that "unvaccinated" employees who do not have a medical or religious exemption are impaired by a contagious disease and simultaneously assume that they are impaired by a suppressed or weak immune system or respiratory system that makes them vulnerable to "Covid-19".

**116.** The defendant made a record of the impairment its policy is intended to treat, by documenting plaintiff's "vaccination status" (even though plaintiff refused to disclose his medical records) via its communication, attitude and treatment of the plaintiff.

**117.** The defendant mis-classified the plaintiff and made a record of impairment by imposing its policy upon the plaintiff without any diagnosis, but based upon pure speculation, generalization and stereotype.

**118.** The defendant made a record of disability by classifying the plaintiff as an "unvaccinated" employee, and classifying him as needing to wear a mask and self-test which led to defendant to repeatedly threaten plaintiff with termination; falsify company records; impose prohibited medical examinations and inquiries; and terminate plaintiff's employment for reasons of disability. Thus, defendant caused plaintiff to suffer loss of income and employment opportunities.

**119.** The mitigation measures imposed by defendant's "Covid-19 Policy" also create physical impairments that substantially limit the plaintiff's ability to engage in one or more major life activities, including working, communicating and interacting with others.

**120.** The defendant, by its own policies, attitude toward the plaintiff, written communications, method of record-keeping and general treatment of the plaintiff, created a set of facts that satisfy the criteria under the ADA's "record of" disability prong.

### PROTECTION UNDER THE ADA

**121.** The defendant's "Covid-19 Policy" was not uniformly or universally applied to the plaintiff once the defendant began making a record of such disability by mis-classifying the

plaintiff as having an impairment which needed to be treated or cured by the defendant's "Covid-19 Policy".

**122.** Upon giving the defendant notice that he was regarded as having a disability,[9] the plaintiff identified himself as being within a protected group.

**123.** Plaintiff was regarded as having a disability, upon claiming his rights to refuse the defendant's accommodations based upon his good faith opposition, he engaged in a protected activity.

**124.** The defendant applied the policy to everyone equally and failed to recognize that the plaintiff opposed the policy.

**125.** The defendant applied its "Covid-19 Policy" to everyone equally and failed to recognize that the plaintiff gave notice of being regarded as having a disability.

**126.** The defendant applied its "Covid-19 Policy" to everyone equally and failed to recognize that the plaintiff objected to submitting to the defendant's "accommodations".

**127.** The defendant applied its "Covid-19 Policy" to everyone equally and failed to recognize that the plaintiff was within a protected class and engaged in a protected activity.

**128.** The plaintiff therefore was not subject to the same "Covid-19 Policy" as everyone else who had not invoked their rights under the ADA.

**129.** As an analogy: consider a defendant requiring a wheelchair-bound employee to use the stairs or face loss of income, title or employment termination because *everyone is required to use the stairs and the policy is applied equally to everyone.* It is clear that this is an erroneous conclusion that does not allow disability rights.

### ABSENCE OF AN ADA EXEMPTION FOR EMPLOYER

**130.** Regarding each incident of the plaintiff's good faith refusal to accept defendant's "Covid-19 Policy" measures, and the defendant's adverse response, the plaintiff was in a protected class and engaged a protected activity, and was not required to participate in the defendant's policy under 29 CFR Part 1630.9(d), unless the defendant established an exemption or exception to its legal duty to comply with the ADA.

---

9 As an employee he is, of course, understood to be a "qualified individual".

**131.**   The defendant failed to identify or describe any set of facts establishing that the plaintiff's good faith refusal to participate in the defendant's "Covid-19 Policy" would have created any undue financial hardship.

**132.**   The defendant failed to identify or describe any set of facts establishing that the plaintiff's good faith refusal to participate in the defendant's "Covid-19 Policy" would have fundamentally altered their normal operations. In fact, the defendant's policy itself already did in fact fundamentally alter their normal operations.

**133.**   The defendant required non-job-related medical examinations of the plaintiff that were not consistent with any conceivable business necessity.

**134.**   The defendant made disability-related inquiries of the plaintiff that were not consistent with business necessity and not permitted under 29 CFR Part 1630.13(b).

**135.**   The defendant failed to establish any set of facts that proved that its regarding the plaintiff as carrying the "Covid-19 disease" was transitory or minor.

**136.**   If the disability is **both** transitory **and** minor, such as having the common cold, the defendant should establish the necessity of such a draconian policy.

**137.**   There is no established end-date when the defendant would cease regarding the plaintiff in need of mitigation.

**138.**   The defendant cannot now claim that such disability is "transitory", especially since it is not acting upon any medical diagnosis, court order obtained by the Department of Health, or any individualized assessment establishing that the plaintiff individually is a direct threat.

**139.**   To this day, the defendant has failed to demonstrate that it met or satisfied any exemptions or exceptions to its *bona fide* legal duties under the ADA to aid and encourage those with disabilities, including the plaintiff.

**140.**   The plaintiff's allegations easily satisfy the elements of discrimination by showing that he falls within a protected group, that he is qualified for the position he held, that he was subject to adverse employment actions and that the adverse employment actions were taken under circumstances which constitute unlawful discrimination.

**141.**   The plaintiff demands a jury trial.

**WHEREFORE** plaintiff demands injunctive relief, including but not limited to: (i) a judgment from this Court that defendant's actions were unlawful; (ii) back pay; (iii) compensatory damages in whatever amount the plaintiff is found to be entitled; (iv) reinstatement, or in the alternative front pay in the event reinstatement is not practical; (v) an equal amount as liquidated damages, other monetary damages; (vi) an award of costs and reasonable court fees; and (vii) punitive damages to the extent available; (viii) pre-judgment and post-judgment interest; and (ix) a jury trial on all issues so triable, and for other relief deemed appropriate by this Court.

## COUNT II. COMPLAINT FOR RETALIATION IN VIOLATION OF THE ADA AS AMENDED IN 2008

**142.**   The plaintiff sues the defendant for retaliation in violation of the ADA and the ADA-AA.

**143.**   The plaintiff re-alleges the foregoing statements of fact and allegations from his complaint for discrimination in Count I along with his affidavit, and further alleges the following.

**144.**   Upon giving defendant notice that he was regarded as having a disability and that he was a qualified individual with a disability, the defendant began retaliating against the plaintiff by imposing punitive measures and adverse employment actions, upon him for his good faith refusal to participate in the defendant's offered accommodations.

**145.**   The defendant's "Covid-19 Policy" depends solely upon getting the employee to voluntarily waive his rights to medical privacy and disclose such records through coercion and retaliation, any act by an employer designed to deter an employee from claiming their rights is an adverse employment action under the ADA and is prohibited by law.

**146.**   The defendant implemented a policy which regarded the plaintiff as disabled and when the plaintiff refused mitigation measures, the defendant responded with adverse employment actions.

**147.**   The defendant admits that refusing to disclose the plaintiff's PCR test results would directly and causally result in the plaintiff's contract being either terminated or not renewed.

**148.**   Beginning from the moment he gave such notice to the defendant, the plaintiff suffered adverse employment actions[10] and the defendant continued attempting to impose its "Covid-19 Policy" upon the plaintiff.

**149.**   Defendant ignored and denied the plaintiff's claim of disability, reprimanded him, on a daily basis, for refusing its accommodations as alleged in the plaintiff's affidavit, and finally, terminated his employment as alleged in his affidavit.

**150.**   Title 29 of Part 1630.12(b) prohibits employers from retaliating against employees, namely the plaintiff for exercising and enjoying his rights under the ADA,  specifically, "[i]t is unlawful to coerce, intimidate, threaten, harass or interfere with any individual in the exercise or enjoyment of, or because that individual aided or encouraged any other individual in the exercise of, any right granted or protected by this part."

**151.**   The defendant retaliated by seeking to impose its "Covid-19 Policy" upon the plaintiff in violation of its *bona fide* legal duty of care under the ADA.

**152.**   The defendant's "Covid-19 Policy" classified the plaintiff in such a way that his employment opportunities were adversely affected and limited because the defendant would not permit the plaintiff to do his job without first submitting to defendant's accommodations ("mitigation measures").

**153.**   The defendant proceeded to repeatedly threaten plaintiff with termination, and terminate plaintiff's employment for reasons of disability, actions that causally resulted in the plaintiff's loss of assignment (job opportunities) and income.

**154.**   The plaintiff exercised his right to refuse the defendant's "Covid-19 Policy" measures based upon a good faith belief that the policy did not apply to him because of the foregoing alleged failure of the defendant to establish any exemption or exception to its legal duty to comply with the ADA.

**155.**   Exercising this right is a protected activity and the defendant's "Covid-19 Policy" was not equally or universally applied to the plaintiff because he had given notice of a disability and was therefore in a protected class and engaged in a protected activity.

---

10 Under the ADA, adverse employment actions include any actions taken which interfere the with the plaintiff claiming their rights; which deter plaintiff from claiming their rights or which punish or retaliate against the plaintiff for claiming their rights.

**156.**   The plaintiff exercised his right to refuse the defendant's policy measures based upon a good faith belief that the policy did not apply to him because the policy was not related in any way to his essential job function.

**157.**   The plaintiff exercised his right to refuse the defendant's policy measures based upon a good faith belief that the policy did not apply to him because the defendant failed to give plaintiff conspicuous notice as the manner in which its policy was related in any way to his essential job function.

**158.**   The defendant imposed pecuniary measures and other adverse employment actions upon plaintiff which included the loss or threatened loss of pay, isolation, segregation, diminished employment responsibilities, interference with his rights as alleged in his affidavit.

**159.**   Each time the plaintiff exercised his right to refuse the defendant's accommodations, he did so in good faith, and the defendant subsequently, in a manner that was causally-related to the exercise of such right, imposed adverse employment actions upon the plaintiff for no necessary reasons other than to deter him and punish him for exercising his rights.

**160.**   The defendant imposed adverse employment actions upon the plaintiff which included, isolation and segregation, or sending him home so that he could not perform his essential job functions.

**161.**   The defendant's "Covid-19 Policy", as alleged herein and described in more detail in the plaintiff's affidavit, describes a materially adverse change in the terms and conditions of employment, compared to the conditions of employment which existed prior to the defendant's implementation of its "Covid-19 Policy".

**162.**   These changes did not simply create an inconvenience for the plaintiff, they substantially altered the manner in which he was able to do his job and interact with co-workers by substantially impairing his ability to perform his essential employment duties.

**163.**   The "Covid-19 Policy" is technically voluntary and yet the defendant imposed pecuniary measures and other adverse employment actions as a direct and proximate cause of the plaintiff's good faith refusal to participate or accept the provisions of the policy.

**164.**   Each of the foregoing adverse employment actions resulted from every effort the defendant undertook to coerce the plaintiff into submitting to its "Covid-19 Policy" accommodations.

**165.**   Each adverse employment action described herein was causally related to plaintiff's good faith refusal to comply with the defendant's policy.

**166.**   Each adverse employment action took place within moments of, or in direct response to, plaintiff's expression of his good faith refusal to comply with the defendant's policy.

**167.**   These facts demonstrate the defendant's adverse employment actions derived from the "Covid-19 Policy" and defendant' failure to comply with the ADA.

**168.**   This constituted a materially adverse change in the terms and conditions of employment.

**169.**   Before the defendant's "Covid-19 Policy", the plaintiff and other employees were protected by disability law, medical privacy rights and the right to informed consent (which as explained previously are rooted in and protected by the ADA), the right to be heard, and the right to have a complaint for harassment heard impartially by the defendant, and after the defendant's adoption of its "Covid-19 Policy", all of those rights were ignored and violated in a direct and causal response to the plaintiff's exercise of his right to refuse.

**170.**   These changes were not just "disruptive" or inconvenient; they were not merely limited to include a change in plaintiff's employment duties.

**171.**   These changes included (actual or likely) termination of employment, isolation, demotion, decrease in wages and loss of benefits and were each causally-related to each time the plaintiff chose to exercise and enjoy his rights under the ADA.

**172.**   Ultimately, the defendant did terminate the plaintiff's employment as a direct and proximate cause of his refusal to participate in the defendant's "Covid-19 Policy".

**173.**   The plaintiff was engaged in the protected activity of refusing in good faith to participate in its "Covid-19 Policy".

**174.**   The defendant was aware of plaintiff refusal from the very moment he expressed that he was regarded as having a disability and began refusing to participate in the policy.

**175.**   Each time the defendant approached the plaintiff with a demand or request to submit to the terms of the "Covid-19 Policy", the defendant informed the plaintiff that he would be penalized, such as the plaintiff has previously alleged.

**176.**   Each time the plaintiff exercised his right to refuse, the defendant undertook adverse employment actions against the plaintiff as previously alleged, and in each instance, such measures were causally related to the incident of refusing the policy and suffering penalties or pecuniary measures imposed by the defendant and each of these are detailed in the foregoing allegations.

**177.**   The plaintiff demands a jury trial.

   **WHEREFORE** plaintiff demands injunctive relief, including but not limited to: (i) a judgment from this Court that defendant's actions were unlawful; (ii) back pay; (iii) compensatory damages in whatever amount the plaintiff is found to be entitled; (iv) reinstatement, or in the alternative front pay in the event reinstatement is not practical; (v) an equal amount as liquidated damages, other monetary damages; (vi) an award of costs and reasonable court fees; and (vii) punitive damages to the extent available; (viii) pre-judgment and post-judgment interest; and (ix) a jury trial on all issues so triable, and for other relief deemed appropriate by this Court.

DATED this 30 day of November, 2022.

Stephen West

Plaintiff in *propria persona*